**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| ALLEN D. BISHOP, III<br>169 WILSON STREET, APT. 206<br>COLUMBUS, OHIO 43204, | : <br> : <br> : <br> : | CASE NO.    2:10cv3052 |
| and | : <br> : | JUDGE |
| MARCELLUS MURRAY,<br>1936 TORCHWOOD DRIVE<br>COLUMBUS, OHIO 43229, | : <br> : <br> : <br> : | MAGISTRATE JUDGE |
| Plaintiffs, | : <br> : <br> : <br> : | |
| v. | : <br> : | **COMPLAINT** |
| COULTER VENTURES, LLC,<br>*DBA* ROGUE FITNESS<br>C/O KEVIN M. MUELLER, ESQ.,<br>STATUTORY AGENT,<br>545 E.5TH AVENUE,<br>COLUMBUS, OH 43201, | : <br> : <br> : <br> : <br> : <br> : <br> : | |
| and | : <br> : | |
| WILLIAM "BILL" HENNIGER,<br>FOUNDER AND CO-OWNER,<br>ROGUE FITNESS,<br>545 E.5TH AVENUE,<br>COLUMBUS, OH 43201, | : <br> : <br> : <br> : <br> : <br> : | |
| and | : <br> : | |
| CAITY MATTER HENNIGER,<br>CO-OWNER, ROGUE FITNESS<br>545 E.5TH AVENUE,<br>COLUMBUS, OH 43201, | : <br> : <br> : <br> : <br> : | |
| | : | **JURY DEMAND ENDORSED HEREON** |
| Defendants. | | |

**I.    PRELIMINARY STATEMENT**

1.    This action seeks economic, compensatory, and punitive damages, declaratory, and injunctive relief arising out of unlawful retaliation, in violation of the FLSA's anti-retaliation provision, 29 U.S.C. § 215(a)(3) and the anti-retaliation provision under Section 34(a) of the

1

State of Ohio's Constitution, by Defendants Coulter Ventures, LLC, dba Rogue Fitness, and its owners and head managers, William "Bill" Henniger and Caity Matter Henniger, against Plaintiffs Allen D. Bishop, III and Marcellus Murray when they demoted and/or terminated Plaintiffs because of their protected activity in complaining about pay practices and/or opting-in and later becoming named plaintiffs in a federal collective action and state class action lawsuit asserting claims against Defendants under the Federal Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, the Ohio Minimum Fair Wage Standards Act, O.R.C. §§ 4111.01., 4111.03 and 4111.10, and the Ohio Prompt Pay Act.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over Plaintiffs' FLSA claim pursuant to 28 U.S.C. §§ 1331 (federal question); 1337(a) (statutory regulation of commerce); and 29 U.S.C. § 216(b).

3. This Court has supplemental jurisdiction over Plaintiffs' retaliation claims under Section 34(a) of the State of Ohio's Constitution pursuant to 28 U.S.C. §1367.

4. Venue in this Court is proper pursuant to 28 U.S.C. § 1391 and S.D. Ohio Civ. R. 82.1(b) because Plaintiffs were employed by and performed their job duties for Defendant in Franklin County, Ohio where Defendants regularly conduct business.

## III. PARTIES

5. Plaintiff Allen D. Bishop, III ("Mr. Bishop", "Plaintiff Bishop", or collectively "Plaintiffs") is a 40-year-old African-American male who began working for Defendants on August 8, 2013, in their Warehouse Department as a Picker; he later moved to the Manufacturing Department as a Machine Operator, a position he held from approximately May of 2015 until March of 2019 when he was promoted to Team Lead, which was his position until his demotion

to Machine Operator on April 9, 2020. Mr. Bishop is a resident of Columbus, Ohio (Franklin County).

6. Plaintiff Marcellus Murray ("Mr. Murray", "Plaintiff Murray", or collectively "Plaintiffs") is a 25-year-old African-American male who began working for Defendants in their Warehouse Department as a Picker in November of 2018 and remained in that position until March of 2019 when he moved to the Freight Division as a Packer, which was his position until his termination on May 5, 2020; he sometimes worked in the Manufacturing Department (including Assembly and Labor Divisions), as assigned. Mr. Murray is a resident of Columbus, Ohio (Franklin County).

7. At all times material to the lawsuit, Defendant Coulter Ventures, LLC, *dba* Rogue Fitness ("Rogue Fitness" or collectively "Defendants"), was an Ohio limited liability company that manufactures and supplies fitness equipment locally and around the world, and is headquartered in Columbus, Ohio (Franklin County) where it owns 43 acres of land and buildings, employs approximately 600 employees, and is a global leader in manufacturing and distribution.

8. Defendant William "Bill" Henniger ("Mr. Henniger" or collectively "Defendants") is the husband of Defendant Caity Matter Henniger and the majority owner and founder of Rogue Fitness, who, at all times material to this lawsuit acted directly or indirectly in the interest of Rogue Fitness in relation to Mr. Bishop's and Mr. Murray's employment status. Mr. Henniger approved the adverse employment actions against them, exercising his power as a chief corporate officer with a significant ownership interest in Rogue Fitness who controlled significant aspects of its day-to-day functions, including the demotion and termination of its employees.

9. Defendant Caity Matter Henniger ("Ms. Henniger" or collectively "Defendants") is the wife of Mr. Henniger and an owner of Rogue Fitness, who, at all times material to this lawsuit, acted directly or indirectly in the interest of Rogue Fitness in relation to determining Plaintiffs' employment status. Ms. Henniger approved the adverse employment actions against them, exercising her power as a chief corporate officer with a significant ownership interest in Rogue Fitness who controlled significant aspects of its day-to-day functions, including the demotion and termination of its employees.

## IV. FACTS

### A. Plaintiff Allen Bishop III.

10. Plaintiff Bishop opted-in as a plaintiff to a collective and class action lawsuit asserting claims under the FLSA, the Ohio Minimum Fair Wage Standards Act, O.R.C. §§ 4111.01., 4111.03 and 4111.10, and the Ohio Prompt Pay Act ("OPPA") filed on November 18, 2019, against Defendants, captioned *Braun v. Coulter Ventures, et al.*, No. 2:19-cv-5050 (S.D. Ohio, 2019) ("the lawsuit").

11. Mr. Bishop began complaining about his pay, including hours that would constitute overtime pay, to supervisors and Human Resources ("HR") in October 2019, as he was directed to come in thirty minutes early each shift to do tool changes and he realized he was not being paid for that time.

12. Around early October 2019, Mr. Bishop asked his direct supervisor, José Cabrera ("Supervisor Cabrera"), if he was being paid for the tool changes he had been doing all of summer 2019 and was still performing.

13. Supervisor Cabrera indicated he did not know and to ask Supervisor Andy Jerskey ("Supervisor Jerskey") about the pay and hours miscalculation.

4

14. Mr. Bishop then asked Supervisor Jerskey if he was being paid for the time he was coming in early to do the tool changes.

15. Supervisor Jerskey insisted that he was being paid and brushed it off.

16. Following that interaction, Mr. Bishop reviewed his payroll and hours for the time period he had been performing the tool changes and noticed there had in fact been a miscalculation which affected his overtime hours for which he was not compensated.

17. Prior to the end of October 2019, Mr. Bishop documented the miscalculations on a piece of notebook paper and presented it to Supervisor Jerskey.

18. Supervisor Jerskey advised Mr. Bishop that HR would look into the issue and get back to him.

19. Mr. Bishop, Mr. Murray, and most other Rogue Fitness employees receive performance reviews every quarter.

20. Defendants use a scaled rating system of 1.0 to 5.0, where 1.0 is the best score and 5.0 is the worst score.

21. Defendants use the First and Third Quarter performance reviews as the basis for the Second and Fourth Quarter reviews.

22. After complaining about his pay and overtime being miscalculated when he was doing tool changes, on November 13, 2019, Mr. Bishop was given a score of 3.0 in his Third Quarter performance review.

23. Prior to November 2019, before he made complaints about his pay and overtime miscalculations, Mr. Bishop's average performance review score was a 2.0 out of 5.0.

24. The only reason cited by Supervisor Jerskey and the Plant Manager, Corey Rife ("Plant Manager Rife"), was an alleged "attitude problem" he displayed.

25. The meeting included Supervisor Jerskey, Plant Manager Rife, and HR Manager Amanda Simons; prior to this performance meeting, HR was not present during Mr. Bishop's quarterly reviews.

26. Mr. Bishop asked for specific examples of his attitude problem and was told that him asking for examples was an example of an attitude.

27. In the same review, Supervisor Jerskey and Plant Manager Rife praised his work performance but rated him with a 3.0 because of his alleged attitude problem.

28. Mr. Bishop opted-in to the lawsuit on December 3, 2019.

29. On December 24, 2019, Mr. Bishop heard back from Brian LNU in HR when they completed an audit about the pay and overtime miscalculations that he complained about to Supervisor Jerskey in October 2019.

30. Brian in HR told Mr. Bishop that it did appear his pay was shorted and that HR conducted an audit back to March which identified a number of "process issues."

31. Brian in HR gave Mr. Bishop a spreadsheet documenting all of his clock-in and clock-out times and that they would provide him with a check for the time missed.

32. Brian in HR further explained that in January they were going to "eliminate the rounding issue" and move to "straight clock-in, clock-out."

33. Mr. Bishop later received a check from HR but not for all of the time he complained about, because HR only accounted for the tool change time since he had become a Team Lead and not the time he was missing payment for hours working as an Operator.

34. On January 21, 2020, Supervisor Jerskey and Plant Manager Rife again met with Mr. Bishop and brought up a perceived "attitude problem" and advised him to "work on it."

35. On January 23, 2020, Mr. Bishop received an impromptu performance review from Supervisors Jerskey and Chad Maloney ("Supervisor Maloney"), framed as a discussion on how to get a better review for the upcoming quarter.

36. In this conversation, Mr. Bishop was again told he was doing great work and the work was always completed properly, but maintained he had an "attitude problem."

37. Supervisor Jerskey told Mr. Bishop that there was not a question that Mr. Bishop knew what he was doing in terms of job performance and that he was good at what he does, but when he asked him to do something, he felt like there would always be a "battle."

38. Mr. Bishop stated that he did not agree with that perception and questioned why Supervisor Jerskey already had perceptions about his behavior before he approached him.

39. Supervisors Jerskey and Maloney said that during most work hours, Mr. Bishop's attitude was "written all over his face" and that he was "very defensive."

40. Supervisor Maloney said he did not want to move Mr. Bishop from the department because Mr. Bishop possessed a lot of knowledge about the job but maintained Mr. Bishop showed his emotions on his face and displayed an "attitude."

41. Supervisors Jerskey and Maloney also maintained they wanted to focus on the "big picture" and not on "specific examples" when Mr. Bishop was asking for such examples and he questioned whether their perceptions were only because he did not smile much at work.

42. Supervisors Jerskey and Maloney told Mr. Bishop that he asked questions in a "disrespectful manner" but could not point to specific examples when requested; they also said that, if he was not smiling at work, then he should tell the team why he is in a bad mood.

43. On March 12, 2020, Mr. Bishop filed a declaration in the lawsuit attesting to violations of the FLSA he was experiencing by Defendants.

44. On March 14, 2020, Mr. Bishop went on Family Medical Leave Act ("FMLA") leave for a serious health condition and returned on April 6, 2020.

45. Upon his return, Defendants assigned him to a different department than his regular job without an explanation.

46. On April 9, 2020, Mr. Bishop was given another impromptu performance review and was scored at a 4.75 out of 5.0, with 5.0 being the worst rating.

47. Mr. Bishop was the only employee to receive a performance review in April, as the next quarter's review was scheduled for June 2020.

48. Based on his 4.75 score on his review, Mr. Bishop was demoted from Team Lead to Machine Operator because his review score was "too low."

49. The demotion caused a two dollar per hour decrease to Mr. Bishop's hourly rate.

50. Mr. Bishop asked why he was given such a low score and was simply told by management that they were not going to debate him on the score.

51. Defendants did not provide Mr. Bishop with a copy of the April 9, 2020 performance review at the time it was given.

52. On April 13, 2020, Mr. Bishop had to take medical leave again pursuant to pandemic precautions and returned on May 4, 2020.

53. On April 17, 2020, Mr. Bishop joined the collective and class action lawsuit as a named Plaintiff.

54. On May 15, 2020, Mr. Bishop received another impromptu written performance review via email with a score of 4.0, giving him negative responses ("disagree" and "strongly disagree") to each performance metric except for one marked "neutral".

55. The performance metrics were subjective indicia of performance, including only four categories: "If it were my money, I would award this person the highest possible compensation increase and bonus"; "Given what I know of this person's performance, I would always want them on my team"; "The team member is at risk for low performance"; and "This team member is ready for promotion today."

56. Mr. Bishop was not afforded the opportunity to discuss the contents of the May 15 email performance review, although he requested the opportunity to do so.

57. Defendants intentionally rated Mr. Bishop below his actual performance using subjective indicia of performance and used those performance reviews as pretext to demote him and cut his pay in retaliation for Mr. Bishop's protected activity in complaining about his pay and overtime miscalculations and in joining the FLSA lawsuit; but for his protected activity, he would have received accurate performance reviews consistent with those he received in the past and reflecting the actual strength of his performance and retained his position.

58. Defendants' retaliation caused Plaintiff Bishop emotional distress, humiliation, frustration, and a $2.00 per hour pay decrease when he was demoted.

59. Defendants violated the FLSA's anti-retaliation provision, 29 U.S.C. § 215(a)(3), and the anti-retaliation provision under Section 34(a) of the State of Ohio's Constitution when they demoted Plaintiff Bishop and cut his pay in retaliation for him engaging in protected activity and joining the collective and class action lawsuit.

60. Defendants' demotion of Plaintiff Bishop was done in reckless disregard of his rights under the FLSA and the Ohio Constitution.

61. Defendants' retaliation against Plaintiff Bishop was not done in good faith, and Defendants lacked reasonable grounds for believing that their retaliation was not a violation of the FLSA.

### B. Plaintiff Marcellus Murray

62. Plaintiff Murray opted-in as a plaintiff to a collective and class action lawsuit asserting claims under the FLSA, the Ohio Minimum Fair Wage Standards Act, O.R.C. §§ 4111.01., 4111.03 and 4111.10, and the Ohio Prompt Pay Act ("OPPA") filed on November 18, 2019 against Defendants, captioned *Braun v. Coulter Ventures, et al.*, No. 2:19-cv-5050 (S.D. Ohio, 2019) ("the lawsuit").

63. Plaintiff Murray began his employment with Defendants in November of 2018 in the Warehouse Department, where he worked as a Picker and a Packer until March of 2019; he worked in the Freight Division beginning in March of 2019, worked in the Assembly Division of the Manufacturing Department between September of 2019 and October of 2019; and Defendants terminated him on May 5, 2020.

64. Mr. Murray opted-in to the lawsuit on November 21, 2019.

65. On April 17, 2020, Plaintiff Murray joined the collective and class action lawsuit as a named Plaintiff.

66. After joining the lawsuit as a named Plaintiff, Mr. Murray was moved from his regular assigned job in the Freight Division to a Picker in the Warehouse Department without explanation.

67. On May 1, 2020, Mr. Murray was scheduled to work in the Freight Division of the Warehouse from 4:00 p.m. until 12:30 a.m.

68. Plaintiff Murray's job duties as of May 1, 2020 included, but were not limited to, scanning, banding, and wrapping merchandise orders on assigned carts throughout his shift; Plaintiff scanned items on approximately one to two carts per hour, or approximately ten to eleven carts per eight hour shift.

69. A scanner was provided to Mr. Murray for use on each shift and he had a personal code and credentials required to log in and out of his scanner, which recorded information regarding the items he scanned and production for each shift.

70. On May 1, 2020 at approximately 8:00 p.m. or halfway through Mr. Murray's shift, he informed his superiors that his scanner was no longer working.

71. A new scanner was assigned to him with a generic log-in code, which he used for the rest of his shift, instead of the personal log-in credentials that he normally would have used.

72. Shortly before his shift ended, Plaintiff Murray was advised that all of the items on a cart scanned with the new scanner and generic log-in credentials were scanned incorrectly; Plaintiff Murray had not experienced a problem of this nature during the entire one and a half years that he had been performing the job and scanning items on assigned carts.

73. On the following Monday, May 4, 2020, Mr. Murray worked his regular shift using his personal credentials and code to log onto his scanner and had no further issues with scanners.

74. On Tuesday, May 5, 2020, Mr. Murray was called into a meeting with a HR Representative and two supervisors, where he was informed that he scanned all items on a cart incorrectly when he worked on Friday, May 1, 2020.

75. The items allegedly scanned incorrectly were all scanned with the new scanner and generic log-on code assigned to him after his scanner malfunctioned on May 1, 2020.

76. During the meeting held when Plaintiff Murray was terminated, Defendants provided him with a "Progressive Disciplinary Notice" displaying a single violation for "Failure to Do Job."

77. The Progressive Disciplinary Notice Plaintiff Murray received indicates there were five levels of lesser discipline that could have been administered prior to terminating him: verbal warning, written warning, 4 hours suspended, 8 hours suspended, and 1-week suspension.

78. Plaintiff Murray was advised that, although Defendants had the option of suspending him for one week, they were instead terminating him.

79. Defendants' "Team Member Handbook" reads "[I]f a team member hits level 4 or above, (3) times in a calendar year OR has 15 total incidents in the calendar year they will be terminated."

80. Plaintiff Murray did not hit disciplinary level 4 or above (3) times in a calendar year or have 15 total incidents in the calendar year, which the Team Member Handbook indicates would result in termination.

81. Plaintiff Murray was accused of "Failure to do Job Assignment" on his May 1, 2020 shift, just fourteen days after becoming a named plaintiff in the lawsuit.

82. Plaintiff Murray was terminated on May 5, 2020 for alleged "Failure to do Job Assignment" on his May 1, 2020 shift, even though his superiors advised he could have received a 1- week suspension, and despite not hitting disciplinary level 4 or above 3 times in a calendar year and not having 15 total incidents in 2020.

83. Defendants terminated Plaintiff Murray in retaliation for him participating and becoming a named plaintiff in the collective and class action lawsuit; but for his protected

activity, he would have either received no discipline in light of the seemingly errant scanner or, at most, a one-week suspension.

84. Defendants' retaliatory termination of Plaintiff Murray violated the FLSA's anti-retaliation provision, 29 U.S.C. § 215(a)(3), and the anti-retaliation provision under Section 34(a) of the State of Ohio's Constitution.

85. Despite the exercise of reasonable diligence, Plaintiff Murray has been unable to secure a position comparable to the one he held while employed by Defendants.

86. Defendants' retaliation caused Plaintiff Murray emotional distress, humiliation, and frustration.

87. Defendants' termination of Plaintiff Murray was done in reckless disregard of his rights under the FLSA and the Ohio Constitution.

88. Defendants' retaliation against Plaintiff Murray was not done in good faith, and Defendants lacked reasonable grounds for believing that their retaliation was not a violation of the FLSA.

## V. Causes of Action

### A. First Count: Violation Of The FLSA's Anti-Retaliation Provision, 29 U.S.C. § 215(a)(3).

88. Plaintiffs incorporate by reference the foregoing allegations as if fully rewritten herein.

89. Defendants demoted Plaintiff Bishop and reduced his pay and terminated Plaintiff Murray in retaliation for Plaintiffs engaging in the protected action of complaining about pay practices and/or opting-in and becoming named plaintiffs in the collective and class action lawsuit.

**B. Second Count: Violation Of The Anti-Retaliation Provision Under Section 34(A) Of The State Of Ohio's Constitution.**

90. Plaintiffs incorporate by reference the foregoing allegations as if fully rewritten herein.

91. Defendants demoted Plaintiff Bishop and reduced his pay and terminated Plaintiff Murray, in retaliation for Plaintiffs engaging in the protected action of opting-in and becoming named plaintiffs in the collective and class action lawsuit.

92. Defendants violated the anti-retaliation provision under Section 34(a) of the State of Ohio's Constitution, which prohibits an employer from discharging or in any other manner discriminating or retaliating against an employee for exercising their rights pursuant to the Ohio Minimum Fair Wage Standards Act, O.R.C. §§ 4111.01., 4111.03 and 4111.10, and the Ohio Prompt Pay Act.

**VI.    Prayer for Relief**

WHEREFORE, Plaintiffs pray that this Honorable Court:

A. Declare that Defendants violated the FLSA's anti-retaliation provision, 29 U.S.C. § 215(a)(3) and the Ohio Minimum Fair Wage Standards Act, O.R.C. §§ 4111.01., 4111.03, 4111.10, and the Ohio Prompt Pay Act, pursuant to the anti-retaliation provision under Section 34(a) of the State of Ohio's Constitution.

B. Award Plaintiffs economic damages for backpay and front pay;

C. Award Plaintiffs liquidated damages equal to the amount of backpay and front pay and compensatory and punitive damages;

D. Award Plaintiffs pre- and post-judgment interest at the statutory rate;

E. Award Plaintiff attorneys' fees and costs; and

F.      Award Plaintiff such further and additional relief as this Court deems just and proper.

Respectfully Submitted:

By: */s/ Helen M. Robinson*
Helen M. Robinson (0097070)
(*hrobinson@marshallforman.com*)
Madeline J. Rettig (0098816)
(*mrettig@marshallforman.com*)
John S. Marshall (0015160)
(*jmarshall@marshallforman.com*)
Edward R. Forman (0076651)
(*eforman@marshallforman.com*)
Samuel M. Schlein (0092194)
(*sschlein@marshallforman.com)*
**MARSHALL & FORMAN LLC**
250 Civic Center Dr., Suite 480
Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780

By: *Jessica R. Doogan*
Jessica R. Doogan (0092105)
(*jdoogan@barkanmeizlish.com*)
Robert E. DeRose
(*bderose@barkanmeizlish.com*)
**BARKAN MEIZLISH DEROSE WENTZ MCINERNEY PEIFER, LLP**
250 E. Broad Street, 10th Floor
Columbus, OH 43215
Phone: (614) 221-4221
Fax: (614) 744-2300

OF COUNSEL:
Louis A. Jacobs (002101)
(LAJOhio@aol.com)
177 19th St., Apt. 9C
Oakland, CA 94612
(614) 203-1255
Fax (614) 463-9780

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues and defenses triable to a jury.

By: */s/ Helen M. Robinson*<br>
Helen M. Robinson (0097070)